UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

ANTHONY GARCIA,

                         Petitioner,

          v.

JOSEPH SMITH,

                        Respondent.

----------------------------------------------------------------x

**<u>Not for Publication</u>**

**<u>MEMORANDUM & ORDER</u>**
11-CV-1332 (PKC)

PAMELA K. CHEN, United States District Judge:

Petitioner Anthony Garcia ("Petitioner" or "Garcia"), through counsel, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Upon review of the record and the submissions of the parties, the Court concludes that the petition must be dismissed as time-barred. However, even were the petition not time-barred, Garcia's claims are without merit. Therefore, for the reasons set forth below, the petition is DENIED in its entirety.

*BACKGROUND*

I.    <u>Factual Background</u>

       a.  <u>Charge Conduct</u>

At Garcia's state court trial, it was established that on the afternoon of August 31, 2000, Garcia entered Jillian's Jewelry Store in Bayside, Queens.[1] (Dkt. 10-3 at ECF 271.)[2] In the store showroom at the time were Fausto Rodriguez, the store owner, and a customer. (Dkt. 10-3 at

---

[1] Because Garcia was convicted, the Court recites relevant facts in the light most favorable to the verdict. *See Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).

[2] Citations to "ECF" pages refer to the page numbering of the Electronic Court Filing ("ECF") system. Citations not so labeled refer to the internal page numbering of the cited source.

ECF 271.)  Unbeknownst to Garcia, also in the store basement were Rodriguez's brother, Daniel Mehias, and another store employee, and in a back room behind a two-way mirror that permitted viewing of the store showroom, was Rodriguez's wife, Blanca.  (Dkt. 10-3 at ECF 275.)  While in the store, Garcia pretended to be a customer in search of an engagement ring, a charade he maintained until the other customer left the store.  (Dkt. 10-3 at ECF 274.)  With the customer gone and the storeroom empty except for Garcia and Rodriguez, Garcia threatened Rodriguez with a gun and demanded that Rodriguez empty the store's safe and give the contents to Garcia.  (Dkt. 10-3 at ECF 275–77.)  Garcia forced Rodriguez at gunpoint into the back room where the safe was located.  There, they came upon Rodriguez's wife.  (Dkt. 10-3 at 276.)  As Rodriguez was emptying the safe at gunpoint, Rodriguez's brother Daniel, unaware that a robbery was in progress, suddenly appeared from the basement to the surprise of those in the back room.  (Dkt. 10-3 at ECF 277.)  Blanca Rodriguez seized the opportunity to attempt to escape, but to no avail—when Blanca reached the store's front doors they were locked.  (Dkt 10-4 at ECF 2.)  As Blanca struggled to exit the store, she heard three gunshots ring out.  (Dkt. 10-4 at ECF 1.)  When she turned around, she saw Garcia, who then pointed the gun at her and demanded that she open the front door so that he could exit the store.  (Dkt. 10-4 at ECF 2.)  At gunpoint, Blanca moved past Garcia toward the door buzzer to unlock the front door.  (Dkt. 10-4 at ECF 2–3.)  Blanca unlocked the door, and Garcia escaped with jewelry from the safe.  (Dkt. 10-4 at ECF 2–3.)  Blanca ran back into the store to discover that her husband had been fatally shot.  (Dkt. 10-4 at ECF 34.)  Rodriguez's brother was unharmed during the incident.

      b.  <u>Investigation and Arrest</u>[3]

The NYPD launched an investigation into the killing of Rodriguez. On August 29, 2000, two days prior to the killing, a Queens residence was burgled by two unidentified men. (Dkt. 10-8 at ECF 9, 38.) During the investigation of that robbery, the police, without consent or a warrant, broke into a car registered to Petitioner's father, Bernadino Garcia, which was parked on the street. (Dkt. 10-8 at ECF 9.) During their search of the car, the police found and recovered a photograph of Petitioner. (*Id.*)

Petitioner's photograph was broadcast by the media on several area television stations as the perpetrator of the Rodriguez homicide. (*Id.*) Juan Calderon, the owner of a Brooklyn pawn shop, saw the photograph and recognized Petitioner as someone who had pawned jewelry at Calderon's shop on August 31, the day of the homicide. (*Id.* at ECF 8–9.) Calderon contacted the police. (*Id.* at ECF 9.) The jewelry was linked to the robbery. (*Id.*) Mrs. Rodriguez also identified Garcia from a photo array containing 14 photographs. (*Id.*)[4]

As a result of the NYPD's investigation, on September 8, 2000, police entered the apartment of Petitioner's sister-in-law, with whom he had been residing for an undisclosed period of time. (Dkt. 10-8 at ECF 10.) The police forcibly, and without a search or arrest warrant, entered Petitioner's sister-in-law's home, arrested Petitioner, and removed him from the premises. (*See* Dkt. 10 at ECF 73.) Upon his arrest, Petitioner spontaneously made incriminating statements to the police en route to the precinct, which were not in response to questioning by the officers. (Dkt. 10 at ECF 73–74; Dkt. 11-1 at ECF 24.) At the precinct, Petitioner made

_____

[3] The Court takes the following facts from Petitioner's brief with respect to his state court appeal.

[4] Petitioner was the only individual in the photo array with visible tattoos. (*Id.*) Although Petitioner noted this fact in his brief on direct appeal, (Dkt. 10-8 at 9), he does not raise that issue in his habeas petition. Nor does he provide any basis for concluding that Mrs. Rodriguez's photographic identification of Petitioner was defective for this reason.

statements admitting his involvement in the August 31 robbery and homicide of Rodriguez, in addition to the August 29 Queens burglary.[5]  (*Id.*)  Petitioner was *Mirandized* at the precinct before making any statements. (Dkt. 10 at ECF 74–76, 83.)

Petitioner then was placed in an in-person line-up.  (Dkt. 10 at ECF 23–25.)  Both Blanca Rodriguez and Daniel Mehias participated in the line-up, and both identified Petitioner as the person in the jewelry store on August 31.[6]  (Dkt. 11 at ECF 39.)

c.  Pretrial Proceedings

Prior to trial, counsel for Petitioner moved to exclude, *inter alia*, the photograph of him obtained by police from his father's vehicle and any in-court or out-of-court identification resulting from that photograph.  (*Id.* at 10–11.)  He did not, however, move to suppress his post-arrest statements, during which he confessed to both the August 31 robbery/shooting and the August 29 burglary.  (*Id.* at 11.)

Nonetheless, the court granted Petitioner's applications for suppression hearings on those matters, including the post-arrest statements, but denied a *Mapp* hearing with respect to the warrantless search of the car on the basis that Petitioner had not established standing to challenge the search of the car.  (*Id.* at 11.)  In January 2003, following the hearings, the court denied all of Petitioner's suppression motions in their entirety.  (*Id.* at 11.)

d.  Trial

In connection with the jewelry store robbery and homicide, Garcia was indicted and charged with one count of Murder in the First Degree; three counts of Murder in the Second Degree; two counts of Robbery in the First Degree; four counts of Robbery in the Second

---

[5]  Petitioner later plead guilty to the burglary charges.  (Dkt. 10 at ECF 236–248.)

[6]  The customer who was in Rodriguez's jewelry store moments before the robbery did not participate in the investigative identification procedures.

Degree; one count of Criminal Possession of a Weapon in the Second Degree; one count of Criminal Possession of a Weapon in the Third Degree; and one count of Tampering with Physical Evidence.  (Dkt. 9 at 2.)  As part of the same indictment, Garcia also was charged with four other armed robberies, and in a separate indictment, he was charged with the August 29 burglary.  (Dkt. 9 at 2.)

The jewelry store robbery and homicide charges were severed from the other robbery charges.  The jewelry store charges proceeded to trial first.

At trial, the state's evidence included the eyewitness testimony of Blanca Rodriguez, ballistics evidence, and Garcia's own written confession.  Following the trial, on December 3, 2003, a jury convicted Garcia of Murder in the First Degree for the killing of Fausto Rodriguez during and in furtherance of the commission of a felony.  (Dkt. 9 at 2; Dkt. 10-7 at ECF 252.) Garcia was sentenced the same day to life in prison without possibility of parole.  (Dkt. 10-8 at ECF 8.)

Later, on March 18, 2004, Garcia pleaded guilty to the charge of Burglary in the Second Degree, in satisfaction of the remaining counts of the indictment and was sentenced to a concurrent term of 8 years' imprisonment.  (Dkt. 9 at 2–3.)

e.  Appeal

Garcia appealed his murder conviction to the Appellate Division, Second Department, on the basis that the evidence at trial was legally insufficient to support the judgment of conviction and that the sentence imposed upon him was harsh and excessive.  (Dkt. 9 at 3.)  The Appellate Division unanimously affirmed the conviction on November 27, 2007.  *People v. Garcia*, 45 A.D.3d 859 (2d Dep't 2007).  The Appellate Division held that Garcia's sufficiency of the evidence objection was preserved for appellate review because his counsel had raised the issue in

a motion for dismissal at the close of the prosecution's case. *Id.* at 859–60. The court ruled on the merits and found that the evidence was sufficient to permit the jury to find that Garcia killed Rodriguez during and in furtherance of a robbery. *Id.* at 860. The Appellate Division also exercised its power of factual review and held that the verdict was not against the weight of the evidence. *Id.*

The New York Court of Appeals denied leave to appeal on February 26, 2008. *People v. Garcia*, 10 N.Y.3d 765 (2008). Garcia's conviction became final 90 days later, on May 26, 2008, when time expired for Garcia to seek a writ of certiorari from the United States Supreme Court. *See Williams v. Artuz*, 237 F.3d 147, 150 (2d Cir. 2001) ("[A] petitioner's conviction bec[omes] final for [AEDPA] purposes when his time to seek direct review in the United States Supreme Court by writ of certiorari expire[s].") (internal quotations omitted).

### f.   Post-Conviction Collateral Attack

In a motion dated May 21, 2009, Garcia sought to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10 on the basis that he received ineffective assistance of trial counsel (the "440 Motion"). (Dkt. 1 at 8; Dkt. 9 at 3.) Respondent maintains, however, that the motion actually was received by the clerk of court on May 27, 2009, as indicated by the date stamp on the cover page of the motion. (*See* Dkt. 15 & accompanying exhibit.)

Garcia's 440 Motion alleged, *inter alia*, that his counsel was deficient for (a) failing to move to suppress the line-up identification evidence and the photograph of Petitioner recovered from Petitioner's father's car; (b) failing to challenge the purportedly warrantless entry and search of the home in which Garcia was staying as a guest; and (c) counsel's failure to present Garcia's testimony at trial. (Dkt. 9 at 3.) Garcia also alleged ineffective assistance of appellate counsel

based on his appellate counsel's failure to allege ineffective assistance of trial counsel on direct appeal.  (Dkt. 10-8 at 88–89.)

In a decision dated February 18, 2010, which was issued in open court on March 2, 2010, the New York Supreme Court denied Garcia's 440 Motion.  (Dkt. 9 at 4; Dkt. 10-8 at ECF 88.)  The court denied Garcia's motion with respect to ineffective assistance of trial counsel on the basis that it was procedurally barred because "[t]here are sufficient facts on the record to have allowed adequate review of the issue on direct appeal but no such appellate determination occurred because defendant unjustifiably failed to raise the issue on appeal."  (Dkt. 10-8 at ECF 90) (citing N.Y.C.P.L § 440.10(2); *People v. Cooks*, 67 N.Y.2d 100, 103 (1986)).  The court further denied Garcia's motion because it was "based upon allegations about the proceedings that are either made solely by him or contradicted by the record and there is no reasonable possibility that the[] allegations are true."  (Dkt. 10-8 at ECF 90) (citing N.Y.C.P.L. § 440.30(4)(c), (d)).

Garcia failed to seek leave to appeal the denial of the 440 Motion within the 30 days permitted by New York law.  N.Y.C.P.L. § 460.10(4)(a).  However, on August 6, 2010, Garcia sought permission to extend the time in which to seek leave to appeal (Dkt. 10-8 at ECF 15), which the Appellate Division granted on November 22, 2010, extending the deadline to January 24, 2011.  (Dkt. 10-8 at ECF 22.)  On March 11, 2011, the Appellate Division denied Garcia's application for leave to appeal the denial of his 440 Motion.  (Dkt. 10-8 at ECF 93.)  Counsel for Garcia, however, states that he did not receive notice of the denial until March 18, 2011, when it was published in the New York Law Journal.  (Dkt. 14 at 2; Dkt. 14-1.)

g.   The Instant Petition

On March 21, 2011, counsel for Garcia submitted this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Dkt. 1.)  Garcia seeks habeas relief on two grounds:  (1) that the evidence at his trial was legally insufficient to support a conviction of first-degree murder; and (2) Garcia's trial counsel was constitutionally deficient for failing to move to suppress the fruits of a warrantless search and for denying Garcia his right to testify.  (Dkt. 1 at ECF 5, 7.) Respondent submitted its opposition to the petition on September 15, 2011.  (Dkt. 9.)  Garcia submitted a reply on October 24, 2011.  (Dkt. 14.)

*DISCUSSION*

I.   Timeliness

AEDPA sets a one-year limitation period for the filing of a petition for a writ of habeas corpus by a person in custody pursuant to a state court conviction.  28 U.S.C. § 2254(d)(1).  The applicable one-year period runs from the date on which one of the following four events occurs, whichever is the latest:

(A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral                                        review;                                        or

(D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

8

28 U.S.C. § 2244. Subsection (A) governs the time limit for the filing of the instant petition. According to subsection (A), the one-year period within which Garcia had to file a habeas petition began running on May 26, 2008, which was when the time expired for him to seek a writ of certiorari based on the denial of his appeal by the Court of Appeals.

    a.  <u>Statutory Tolling</u>

Importantly, 28 U.S.C. § 2244(d)(2) provides that "[t]he time during which a *properly filed* application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is *pending* shall not be counted toward any period of limitation under this subsection." *Id.* (emphases added). In other words, the limitation period is tolled during the pendency of any properly filed application for state post-conviction or other collateral review, such as a 440 Motion. Accordingly, such time does not count towards the one-year limitation period within which to file a petition for habeas relief.

The Second Circuit addressed what constitutes a "properly filed" and "pending" application under 28 U.S.C. § 2244(d)(2) in *Hizbullahankhamon v. Walker*, 255 F.3d 65 (2d Cir. 2001). There, the court reaffirmed its prior holding that "properly filed" simply means "an application for state post-conviction relief recognized as such under governing state procedures." *Id.* at 70 (citing *Bennett v. Artuz*, 199 F.3d 116, 123 (2d Cir. 1999)). And "a state-court petition [for post-conviction or other collateral review] is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures.'" *Id.* (citing *Bennett*, 199 F.3d at 120). Therefore, a "properly filed" application for state review ceases to be "pending," and thus the running of the limitation period commences, when no further appellate review of the application is available.

i.  Tolling With Respect to the 440 Motion

Garcia had 365 days from the day his conviction became final on May 26, 2008 within which to file a petition for federal habeas corpus relief.  In late May 2009, Garcia filed his 440 Motion in New York Supreme Court.  The parties dispute whether the motion should be deemed to have been filed on May 21, 2009, the date on which Garcia "deposited" his motion papers in the mail, or May 27, 2009, the date on which the District Attorney's Office received the papers. (Dkt. 14 at 3; Dkt. 9 at 9.)  Given the legal ambiguity in this area, the short amount of time at issue, and the Respondent's burden to show untimeliness, *see Acosta v. Artuz,* 221 F.3d 117, 121-22 (2d Cir. 2000), the Court construes the date of filing in the light most favorable to Garcia – May 21, 2009.[7]  Therefore, 360 days passed from the date Garcia's conviction became final on May 26, 2008, to the filing of the 440 Motion on May 21, 2009, which began tolling of the limitation period.

---

[7] Although the prisoner mailbox rule applies in federal court, *see Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001), New York courts have been hostile to the concept and have held that motions filed by prison inmates are deemed filed when received by the clerk of court.  *See Matter of Grant v. Senkowski*, 270 A.D.2d 536 (3d Dep't 2000), *aff'd* 95 N.Y.2d 605 (2001) (finding that "the Legislature's intent to treat papers commencing litigation as 'filed' upon the actual receipt of those papers by the clerk of the court—rather than upon delivery to prison authorities for forwarding to the court—is manifest from the statute's language and purpose"); *Matter of James v. Goord*, 281 A.D.2d 825, 826 (3d Dep't 2001) (declining to adopt prisoner mailbox rule for the filing of CPLR article 78 petitions made by pro se prisoners); *Blanche v. Selsky*, 13 A.D.3d 681, 682 (3d Dep't 2004) (same).  However, these New York cases involve civil actions commenced by inmates under New York Civil Practice Law and Rules Article 78 and not criminal proceedings, such as Garcia's 440 Motion.  Similarly, the rules upon which Garcia relies in arguing, in essence, for application of the prisoner mailing rule are *civil* procedural rules.  (Dkt. 14 at 3); N.Y.C.P.L.R. §§ 2211 (a motion on notice is "made" when it is served), 2103(b)(2) and (f)(1) (a motion on notice is served when the moving papers are deposited in first class mail), 101 (the provisions of the New York Civil Procedural Rules "shall govern the procedure in *civil* judicial proceedings in all courts of the state and before all judges.") (emphasis added).  The Court has not identified any case law setting forth whether the prison mailbox rule applies to motions for post-conviction collateral relief made by State prisoners pursuant to New York Criminal Procedure Law.

ii.  Tolling With Respect to the 440 Motion Appeal

The New York Supreme Court denied Garcia's 440 Motion in an order dated February 18, 2010.  Garcia was served with notice of entry of judgment on March 9, 2010.  (Dkt. 9 at 4.)  Under New York law, Garcia had 30 days from receiving notice of that order, or until April 8, 2010, to seek leave to appeal to the Appellate Division.  N.Y. Ct. Rules § 670.12(b)(1) & (b)(2)(vi); CPL § 460.10(4).  According to the Second Circuit in *Bennett v. Artuz*, 199 F.3d 116, 123 (2d Cir. 1999), the 30 days within which a prisoner may seek leave to appeal the denial of a 440 Motion is tolled under AEDPA.  *See Saunders*, 587 F.3d at 548 ("In *Bennett*, we held that a § 440.10 motion is 'pending' for purposes of AEDPA at least from the time it is filed through the time in which the petitioner could file an application for a certificate for leave to appeal the Appellate Division's denial of the motion.").  Garcia did not initially seek leave to appeal the denial of the 440 Motion.  Thus, the limitation period resumed running on April 8, 2010, when time expired for Garcia to seek leave to appeal.

However, on August 2, 2010, Garcia through new counsel sought an extension of time within which to seek leave to appeal the denial of the 440 Motion.  (Dkt. 11-1 at ECF 95–96.)  The Appellate Division granted the extension on November 22, 2010, extending the deadline to January 24, 2011.  (Dkt. 10-8 at ECF 22.)  When the Appellate Division granted Garcia the extension, the limitation period was tolled again because, under *Bennett*, "further appellate review [became available]" and thus Garcia's petition for state post-conviction review was once again "'pending.'"  *See Bennett*, 199 F.3d at 120.  Thus, for purposes of AEDPA, 228 days passed between April 8, 2010, the original deadline for Garcia's appeal of the denial of his 440 Motion, and November 22, 2010, the extended deadline for Garcia's appeal.  *See Bethea v. Girdich*, 293 F.3d 577, 579 (2d Cir. 2002) (*per curiam*) (not tolling for purposes of AEDPA one-year time

11

limit the period between habeas petitioner's conviction becoming final and his filing of a motion for leave to file a late appeal of his conviction).[8]

Garcia moved for leave to appeal on January 11, 2011, which the Appellate Division denied on March 11, 2011. (Dkt. 10-8 at ECF 93; Dkt. 10-8 at ECF 22.)  The limitation period resumed running upon the Appellate Division's denial of leave to appeal because, under New York law, "[t]here is simply no statutory authority in our criminal procedure for review by the Court of Appeals of an Appellate Division order refusing permission to appeal" to the Appellate Division. *People v. James*, 206 A.D.2d 243, 244 (1st Dep't 1994).  Therefore, on March 11, 2011, further appellate review was unavailable, Garcia's application ceased to be "pending," and the limitation period began running again. *See Bennett*, 199 F.3d at 120.  Garcia filed the instant petition 10 days later, on March 21, 2011.

In total, the amount of time that elapsed between Garcia's conviction becoming final and the filing of the instant petition can be calculated as follows:  (1) 360 days from May 26, 2008, when Garcia's conviction became final, to May 21, 2009, when Garcia submitted the 440 Motion; (2) 228 days from April 8, 2010, when time expired for Garcia to seek leave to appeal the 440 Motion, to November 22, 2010, when the Appellate Division granted Garcia the extension; and (3) 10 days from the Appellate Division's denial of leave to appeal the 440 Motion on March 11, 2011, to March 21, 2011, when the instant petition was filed.  Therefore, the amount of untolled time attributable to Garcia for purposes of AEDPA's one-year time limit

---

[8]  In his reply, Garcia assumes, without citing any authority, that the period between the expiration of his time to appeal the denial of his 440 motion and his filing of an application to file a late appeal – which amounted to 228 days – was tolled. (Dkt. 14 at 6.)  Although the Second Circuit does not appear to have directly addressed this issue, Garcia's assumption is unwarranted. *See Saunders*, 1587 F.3d at 548 (a 440 motion is "pending" for purposes of AEDPA at least from the time it is filed until the time when the petitioner could have sought leave to appeal a denial); *Bethea*, 293 F.3d at 579 (time between conviction becoming final and filing of petitioner's motion for leave to file a late appeal not tolled under AEDPA).

is 598 days, which is 233 days late.   Garcia's petition, therefore, is untimely, and must be dismissed as time-barred, unless the Court determines that the limitation period should be equitably tolled.

### b.   Equitable Tolling

The one-year limitation period may be equitably tolled only in "rare and exceptional circumstances," *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005), where "extend[ing] the statute of limitations beyond the time of expiration [is] necessary to avoid inequitable circumstances." *Valverde v. Stinson*, 224 F.3d 129, 133 (2d Cir. 2000); *see Holland v. Florida*, 560 U.S. 631, 644–45 (2010).   Equitable tolling may apply where the petitioner demonstrates that "extraordinary circumstances prevented him from filing his petition on time" and that the petitioner "acted with reasonable diligence throughout the period he seeks to toll." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (*per curiam*).   A petitioner also must show that the extraordinary circumstances *prevented* petitioner from filing a timely petition, which is accomplished by "demonstrat[ing] a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Valverde*, 224 F.3d at 134.

Garcia first argues equitable tolling with respect to the initial filing of the 440 Motion. (*See* Dkt. 14 at 4.)   Garcia argues that equitable tolling should apply if the Court deems the 440 Motion filed any time after May 21, 2009.   (Dkt. 14 at 4.)   The Court already has construed the date in the light most favorable to Garcia, that being May 21, 2009, the date indicated on the motion and the date on which Garcia most likely placed the motion in the mail.   Therefore, Garcia's tolling arguments with respect to that time period are moot.

Garcia advances two other grounds for equitable tolling.  First, he claims that his prior counsel erroneously advised him that "an appeal from the order denying [the 440 Motion] was unnecessary to exhaust state remedies and that [Garcia] had a full year from the denial of that motion to file his federal habeas corpus petition" (Dkt. 14 at 5), *i.e.*, that Garcia had until March 2, 2011 to file this habeas petition.[9]  (Dkt. 14 at 1.)  Second, he argues that the 10-day period between the Appellate Division's denial of leave to appeal the denial of his 440 Motion and the filing of the instant petition should be equitably tolled because he did not receive notice of the Appellate Division's March 11, 2011 denial of leave to appeal until March 18, 2011, when the order was published in the New York Law Journal.  (Dkt. 14 at 5; Dkt. 14-1 (Ex. 1).)

For the reasons discussed below, neither of these grounds warrants equitable tolling.

### i.  Extraordinary Circumstances

#### 1.  Erroneous Attorney Advice

In support of equitable tolling, a petitioner must demonstrate that "extraordinary circumstances" prevented the timely filing of the petition.  *Smith v. McGinnis*, 208 F.3d at 17. Erroneous attorney advice regarding the "rules applied to the deadlines for filing of habeas petitions" generally is the type of "ordinary mistake" by an attorney that does not justify equitable tolling.  *Baldayaque v. United States*, 338 F.3d 145, 152 (2d Cir. 2003).  But "[w]hile 'attorney error *normally* will not constitute the extraordinary circumstances required to toll the AEDPA limitations period . . . at some point, an attorney's behavior may be so outrageous or so incompetent as to render it extraordinary.'"  *Nickels v. Conway*, 480 Fed. App'x 54, 56 (2d Cir. 2012) (summary order) (citing *Baldayaque*, 338 F.3d at 152).  Several Second Circuit cases are

---

[9] Garcia's 440 Motion was denied on February 18, 2010, but he received notice of the denial on March 2, 2010.  (Dkt. 9 at 4; Dkt. 10-8 at ECF 88.)

particularly instructive on the difference between "ordinary" attorney error and error that might rise to the level of an extraordinary circumstance.

In *Baldayaque v. United States*, the petitioner retained an attorney and specifically directed the attorney to file a habeas petition on his behalf.  338 F.3d at 148.  The attorney mistakenly informed the petitioner and his family that it was too late to file a habeas petition even though the petitioner still had nearly 14 months remaining within which to file.  *Id.* at 148–49.  Ultimately, rather than comply with his client's directives, the attorney instead filed a state court motion for commutation of sentence.  *Id.*  The attorney's motion, which "cited no authority" and was obviously deficient, was denied for lack of jurisdiction.  *Id.* at 149.  By the time the attorney informed the petitioner's family that the motion had been denied and that nothing more could be done, the one-year limitation period had expired.  *Id.*  Eighteen months after the attorney's motion was denied, the petitioner filed a *pro se* habeas petition.  *Id.*  The district court dismissed the petition as untimely, but issued a certificate of appealability on the issue of equitable tolling with respect to the attorney's misconduct.  *Id.*  The Second Circuit vacated the district court's dismissal because the district court had dismissed the petition on the basis that, as a matter of law, attorney malfeasance could not be a basis for equitable tolling.  *Id.* at 153.  The Second Circuit held that, as distinguished from the attorneys in *Geraci v. Senkowski*, 211 F.3d 6 (2d Cir. 2000), and *Smaldone v. Senkowski*, 273 F.3d 133 (2d Cir. 2001), whose mistakes regarding deadlines were "ordinary" attorney error, Baldayaque's attorney's conduct was extraordinary.  *Id*. at 152.  Baldayaque's attorney failed to file a habeas petition at all, despite specific directives to do so from his client's family at the behest of the client.  The attorney did no legal research.  The attorney never spoke to his client.  Under those facts, the Second Circuit

concluded that the attorney's "actions were far enough outside the range of behavior that reasonably could be expected by a client that they may be considered 'extraordinary.'" *Id.*

Similarly, in *Dillon v. Conway*, 642 F.3d 358, 363 (2d Cir. 2011), the Second Circuit vacated the district court's dismissal of a habeas petition for failing to properly consider equitable tolling.  There, the petitioner during a meeting with his attorney specifically instructed his attorney "not to wait until the last day to file the petition[,]" and the attorney assured him he would not file a late petition.  *Id.* at 360.  Thereafter, the petitioner's wife called the attorney numerous times to inquire as to the status of the petition and to voice the petitioner's concern "about running out of time," to which the attorney said "he was 'working on the papers' and 'not to worry'."  *Id.* at 361 (internal quotation marks omitted).  The attorney later submitted the petition one day late.  *Id.*  The Second Circuit concluded that the attorney's misleading statements and reassurances constituted extraordinary circumstances beyond the "ordinary" mistakes attorneys make, and remanded to the district court.  *Id.* at 364.  The court held that the attorney's conduct, including the multiple reassurances that he would file on time in the face of the petitioner's wife's *specific* admonitions "to avoid the possibility of a single-day error by not waiting until the last day to file the petition," constituted the type of extraordinary attorney misconduct that merited equitable tolling.  *Id.* at 363.  The Second Circuit specifically noted that "although miscalculating a deadline is the sort of garden variety attorney error that cannot *on its own* rise to the level of extraordinary circumstances, [the petitioner's] case involves more than a single miscalculation" because the attorney "in effect admitted [to] affirmatively and knowingly misleading [the petitioner] by promising him that he would file the petition" by a date certain. *Id.* at 364 (citing *Holland v. Florida*, 560 U.S. 631 (2010)).

As these cases demonstrate, the Second Circuit has only found equitable tolling appropriate where the attorney's conduct involved more than neglect or mistake, and amounted to misconduct or malfeasance, such as making grossly misleading statements about the attorney's intentions to file legal papers, or outright misrepresentations.

Garcia argues that the period from the New York Supreme Court's denial of his 440 Motion to the Appellate Division's denial of leave to appeal that order should be tolled due to the purportedly erroneous advice of Garcia's prior counsel.  (Dkt. 14 at 5; *see* Dkt. 11-1 at ECF 115–117.)  Garcia claims his attorney advised him that "his state remedies had been exhausted and that he had a year from [the denial of the 440 Motion] to file his petition for a writ of habeas corpus."  (Dkt. 14 at 1; Dkt. 11-1 at ECF 115.)  Even assuming the veracity of Garcia's claims, his attorney's conduct was not "so outrageous or so incompetent as to render it extraordinary." *Baldayaque*, 338 F.3d at 152.  Rather, the circumstances here are nearly identical to those in *Geraci* and *Smaldone*, where the Second Circuit held that an "ordinary mistake" made by counsel regarding "the rules applied to the deadlines for filing of habeas petitions" were not so extraordinary as to warrant equitable tolling.  *Dillon*, 642 F.3d at 363.[10]  The alleged erroneous advice given by Garcia's attorney is the type of miscalculation or misapprehension of a deadline that was found to be "garden variety" attorney error in *Geraci* and *Smaldone*, which does not, on its own, constitute an extraordinary circumstance.  *See*, *e.g.*, *Dillon*, 642 F.3d at 363–64.

Garcia's equitable tolling arguments also are weakened by the fact that, even assuming that his attorney misinformed him about timing, Garcia used up almost the entire one-year period

---

[10] In *Geraci*, the petitioner's attorney argued that unusual circumstances justified equitable tolling where counsel filed the habeas petition several days late due to a "miscalculation."  *Geraci*, 211 F.3d at *9.  The Court rejected that excuse, partly on the basis that "[t]here is no indication that Geraci's counsel was concerned about dates and limitations until it was too late to matter."  *Id.*

before filing his 440 Motion.  Garcia waited 360 days after his conviction became final on May 26, 2008, before filing his 440 Motion on May 21, 2009, leaving himself only five days in which to file this petition after the denial of his 440 Motion or any appeal therefrom.  Garcia provides no explanation for the delay in pursuing this collateral relief or any reason for not filing this petition earlier.  Indeed, even if Garcia were not misinformed by his attorney, as he claims, his petition would still be untimely because of the 10 days that elapsed between the Appellate Division's denial of leave for him to appeal the denial of his 440 Motion and the filing of this petition. *See infra* at 17–18.[11]

Accordingly, for the reasons stated above, the 228-day period between the denial of Garcia's 440 Motion and the Appellate Division's grant of an extension of time to appeal that denial does not merit equitable tolling for purposes of AEDPA.

### 2.  10-Day Delay in Filing

Garcia next alleges that equitable tolling is warranted for the 10-day period from when the Appellate Division denied leave to appeal his 440 Motion to the filing of the instant petition. (Dkt. 14 at 5.)  In support of his argument, Garcia cites *Diaz v. Kelly*, 515 F.3d 149, 155 (2d Cir. 2008), in which the Second Circuit held that a *pro se* prisoner was entitled to equitable tolling where he promptly filed his federal habeas corpus petition the day after receiving notice of the state court order that completed the exhaustion of his state court remedies.  There, the Appellate Division denied the petitioner leave to appeal on June 6, 2000.  The petitioner had inquired about the status of his case on December 15, 2000, to which the court responded by letter postmarked January 27, 2001, and which the petitioner received four days later, on January 31, 2011.  *Id.* at

---

[11] Additionally, this calculation gives Garcia the benefit of an additional six days under a liberal application of the federal mailing rule to the filing of his 440 Motion in State court. *See supra* at 9–10.

154. The petition then was filed on February 1, 2011. *Id.* at 152. The Second Circuit held that the petitioner was entitled to equitable tolling of the period from the June 6, 2000 denial of his state court motion to January 31, 2001, when he received notice of that denial. The court so held because of both the state court's extraordinary delay in notifying the defendant of its order and the defendant's diligence in inquiring as to the status of his motion. *Id.* at 155. The Second Circuit noted that it had ruled that "the *statutorily* tolled period in which state court proceedings are 'pending' does not include a brief interval between the entry of a state court order and its receipt a few days after prompt mailing." *Id.* (emphasis added) (internal citation omitted). However, the court had not yet "considered whether a state court's failure to send notice within a reasonable time after entry of an order completing a prisoner's collateral attack can provide a basis for *equitable* tolling." *Id.* (emphasis added). The court concluded that a prolonged delay, such as the delay of more than six months in that case, warranted equitable tolling. *Id.*

Here, the seven-day time period between the state court's denial of leave to appeal the 440 Motion and its publication in the law journal was not such a "prolonged" delay as to constitute an extraordinary circumstance warranting equitable tolling of that time period. (Dkt. 14 at 5.) Garcia argues that his counsel's discovery of the order in the law journal, seven days after it was denied, are "unique circumstances" warranting equitable tolling. (Dkt. 14 at 5.) Garcia points to no authority, and the Court finds none, indicating that such a "brief interval" between the entry of a court order and a petitioner's counsel's discovery thereof constitutes an extraordinary circumstance warranting equitable tolling. Nor does Garcia cite any authority for the proposition that an attorney's lack of knowledge about a change in the court's notification procedures constitutes an extraordinary circumstance. (*See* Dkt. 14 at 2, ¶ 4) (Garcia's attorney

learned of the denial of leave to appeal a week late because he did not know that the court began posting its orders on its website rather than mailing them to parties).

Therefore, the 10-day period between the Appellate Division's denial of leave to appeal the 440 Motion to the filing of the instant petition was not an extraordinary circumstance warranting tolling.

### ii. Reasonable Diligence

Even if Garcia's prior counsel's conduct or the Appellate Division's delay in notifying Garcia's counsel constituted an extraordinary circumstance warranting equitable tolling, Garcia still must demonstrate reasonable diligence on his part throughout the entire time he seeks to toll. "Even where the extraordinary circumstances on which the petitioner rests his claim involve attorney incompetence, the petitioner must still demonstrate that he himself made reasonably diligent attempts to ensure that his petition was filed on time." *Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004) (citing *Baldayaque*, 338 F.3d at 153). "In other words, the act of retaining an attorney does not absolve the petitioner of his responsibility for overseeing the attorney's conduct or the preparation of the petition." *Id.*

The Second Circuit found in *Baldayaque* and *Dillon* that the petitioners "did everything that could have been expected of [them] and . . . went to extraordinary ends to have a [petition timely] filed on [their] behal[ves]." *Dillon*, 642 F.3d at 363 (citing *Baldayaque*, 338 F.3d at 151). In *Dillon*, in which the petitioner was attempting to prove his actual innocence, the Second Circuit specifically noted that Dillon was "persistent in maintaining contact with [his counsel] to insist that he file the petition ahead of the deadline" and urged his attorney "*specifically* to avoid the possibility of a single-day error." *Id.*

In *Nickels v. Conway*, 480 Fed. App'x 54 (2d Cir. 2012) (summary order), the Second Circuit vacated the district court's dismissal of a habeas petition as time-barred for failing to "consider diligence in light of petitioner's unique circumstances" in its equitable tolling analysis. *Id.* at 59.   There, the petitioner's attorneys failed to file a habeas petition despite specific direction from the petitioner to do so and their repeated promises that they would.  *Id.* at 56.  The petitioner's attorneys ultimately abandoned him at the eleventh hour, preventing him from filing a petition on his own in a timely manner.  *Id.* at 58.  The district court faulted the petitioner for not filing a "bare bones" petition prior to expiration of the limitation period and seeking to amend it later, but the Second Circuit held that the district court erred "in not considering what diligence was due from a person in Nickel's circumstance."  *Id.*  The Second Circuit remanded and instructed the district court to "consider all of the circumstances facing [the petitioner] and what diligence would be due from a petitioner facing them."  *Id.* at 59.

Here, the record does not establish that Garcia was reasonably diligent during the longest period he seeks to toll, the 360 days between the denial of his 440 Motion and the date on which he moved for leave to file a late appeal.  Garcia's purported reliance on his counsel's advice that the one-year limitations period restarted upon the denial of his 440 Motion indeed was unfortunate, if true.  But, following his prior counsel's allegedly erroneous advice nearly a year before, Garcia had ample time within which to independently assess the accuracy of his attorney's advice, but did not.  Indeed, Garcia, through his wife, eventually hired new counsel to represent him for purposes of the instant petition, but did not do so until three and one-half months after the denial of the 440 Motion, and even then did not seek an enlargement of time to seek leave to appeal until another month thereafter.  (*See* Dkt. 11-1 at ECF 146.)

21

c.   Actual Innocence

The Second Circuit recognizes "an equitable exception to AEDPA's limitation period in extraordinary cases . . . in which petitioner [makes] a credible and compelling showing of his actual innocence."   *Rivas v. Fischer*, 687 F.3d 514, 552 (2d Cir. 2012); *see also Whitley v. Senkowski*, 317 F.3d 23, 25 (2d Cir. 2003) (holding that district court erred by dismissing on statute of limitations grounds and without further analysis a petition claiming actual innocence). Garcia has not made such a claim or showing, and the record supports no such claim.

Therefore, the Court finds no basis for equitably tolling AEDPA's one-year limitation period.

*          *          *

For the reasons set forth above, Garcia has failed to establish his entitlement to either statutory or equitable tolling of the one-year statute of limitation set forth in 28 U.S.C. § 2244(d)(1).   Accordingly, Garcia's petition must be denied as time barred.   However, were the Court to reach the merits of Garcia's petition, it would dismiss the petition as without merit for the reasons set forth below.

II.      The Merits of Garcia's Petition

In his petition, Garcia sets forth two grounds for relief:  (1) the evidence adduced at trial was legally insufficient to prove murder in the first degree because the evidence showed a lack of intent to kill and; (2) his trial counsel was ineffective for failing to file meritorious suppression motions, call available witnesses, present available exculpatory evidence, and for denying him his right to testify.  (Dkt. 1 at ECF 7.)

a.   <u>Standard of Review under 28 U.S.C. § 2254</u>

Section 2254 provides that a habeas corpus application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "A state court adjudicates a petitioner's federal constitutional claims 'on the merits' when 'it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'"  *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir. 2002) (quoting *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir. 2001)).

"Clearly established federal law 'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'"  *Howard v. Walker,* 406 F.3d 114, 122 (2d Cir. 2005) (quoting *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002)).  A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" a Supreme Court case, or it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent."  *Penry v. Johnson,* 532 U.S. 782, 792 (2001) (internal quotation marks and citations omitted).

A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  *Id.*  (internal quotation marks and citation omitted).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)). The Second Circuit added that, while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

      b.  <u>Insufficiency of the Evidence</u>

Garcia first challenges the sufficiency of the evidence supporting his conviction. (Dkt. 1 at 6.) Namely, Garcia claims that "[e]vidence showed that gun was fired during [sic] course of a struggle. Defendant lacked intent to kill[.]" (Dkt. 1 at 6.)[12]

"In cases challenging the sufficiency of the evidence of a state-court criminal conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

---

[12] This claim is different and distinct from a claim that the verdict was "against the weight of the evidence," which is not cognizable in a federal habeas proceeding. *See Romero v. Napoli*, 08 Civ. 8380 (PAE)(HBP), 2013 U.S. Dist. LEXIS 98821, at *36 (S.D.N.Y. July 15, 2013)6 ("a claim that a verdict is against the weight of the evidence is a purely state-law claim that is not cognizable in a federal habeas corpus proceeding"); *Blake v. Martuscello*, 10-CV-02570 (MKB), 2013 U.S. Dist. LEXIS 95369, at *27 (E.D.N.Y. July 8, 2013) ("It is well settled that a 'weight of the evidence' claim . . . is not reviewable in [a] federal habeas proceeding." (collecting cases)); *Kohler v. Connolly*, 12-CV-1137(JS), 2013 U.S. Dist. LEXIS 60089, at *12 (E.D.N.Y. Apr. 26, 2013) ("A weight of the evidence argument is a state law claim . . . .").

beyond a reasonable doubt.'" *Johnson v. Bellnier*, 508 Fed. App'x 23, 26 (2d Cir. 2013) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).   "In cases challenging the sufficiency of the evidence in a state conviction, a federal court's 'concern is not with the state courts' application of the state law defining the offense, but rather with the state court's application of federal law, and, in particular, the sufficiency standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 [] (1979).'" *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012).   Federal courts "therefore review sufficiency challenges to state-court convictions under a 'doubly deferential standard of review.'" *Id.*

Garcia in his petition argues that the evidence was legally insufficient to support a conviction of first degree murder because the evidence showed that the gun was fired during the course of a struggle and that Garcia lacked intent to kill.  (Dkt. 1 at 6.)  Factual findings of a state court are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).  This presumption "is particularly important when reviewing the trial court's assessment of witness credibility." *Cotto v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003).  Garcia bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  AEDPA provides that habeas relief may be granted with respect to state court factual findings only if the state court made an "unreasonable determination of the facts in light of the evidence presented," which a petitioner must demonstrate by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Garcia does not precisely identify the evidence that showed he lacked the intent to kill when the gun was fired during the course of an alleged struggle.  The only evidence at trial that possibly indicated a struggle was the eyewitness testimony of Daniel Mehias, Rodriguez's brother, who was present at the shooting.  Upon review of the record, however, Garcia's claims are unavailing.

Mehias testified at trial that he saw Garcia pointing the gun at Rodriguez and immediately heard two shots coming out of the gun. (Dkt. 10-6 at ECF 55.) Mehias testified that "I was so near [to the shots] I could feel them. Up to that point I never lost sight of the hand in [sic] the gun." (Dkt. 10-6 at ECF 55.) After that, Mehias testified that Garcia then pointed the gun at him, and he "turned around and [threw himself] toward the basement on the stairs." (Dkt. 10-6 at ECF 55.) After that, Mehias heard another shot. (Dkt. 10-6 at ECF 55–56.) Mehias also testified that the victim never grabbed for the gun in Garcia's hand. (Dkt. 10-6 at ECF 65–66.) Defense counsel, however, cross-examined the witness with his prior grand jury testimony in which the witness stated that "My brother drops the boxes on the floor and tries to grab the person's hand who had the gun. At that time I heard two shots." (Dkt. 10-6 at ECF 68.) Defense counsel continued to vigorously cross-examine the witness, and at the conclusion of the questioning on this point, in response to the defense question, "Did [the victim] reach out [to Garcia] with his hands?" the witness responded "No." (Dkt. 10-6 at ECF 72.)

At the close of evidence, Garcia's counsel moved to dismiss the first degree murder charge on the basis that Mehias's testimony before the grand jury that the victim "trie[d] to grab the person's hand who had the gun" meant that there was a struggle and that, therefore, there was insufficient evidence to establish intentional murder. (Dkt. 107-7 at ECF 82–83.) The trial court reserved decision on the motion for a trial order of dismissal[13] until the close of the case. (Dkt. 10-7 at ECF 84.) After the jury rendered its verdict, the court denied the defense's request to overturn the conviction based on the sufficiency of the evidence. (Dkt. 10-7 at 256.)

The testimony of Mehias was given in open court in front of a jury. Garcia's counsel cross-examined the witness with his prior inconsistent statement. The jury, charged with making

---

[13] A motion for trial order of dismissal, made pursuant to CPL § 290.10, seeks to overturn a guilty verdict on the basis of insufficient evidence.

credibility determinations, necessarily resolved any discrepancies in the testimony given by the witness, and concluded that it did not defeat a finding that Garcia acted with an intent to kill. Garcia has not established that the Appellate Division's determination that the evidence was legally sufficient to establish his guilt beyond a reasonable doubt "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d)(2).  The Appellate Division's decision, therefore, was not "contrary to, or involve[s] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).

In *Cotto v. Herbert*, 331 F.3d 217 (2d Cir. 2003), the Second Circuit upheld the trial court's findings with respect to a witness "credibility clash" which was "resolved by findings of the [judge] who observed the witnesses and found that "the People's evidence was credible, the contrary evidence not."  *Id.* at 233.  That is equally the case here, where the jury observed the testimony of Mehias on both direct and cross-examination, and either did not credit the defense theory that there was a struggle, or determined that if such a struggle occurred, it did not defeat the intent to kill required to support a first-degree murder conviction.  In sum, Garcia has not rebutted the strong "presumption of correctness," of the trial court's fact-findings, "a presumption that is particularly important when reviewing the trial court's assessment of witness credibility." *Id.*  Therefore, Garcia's claim that the evidence supporting his conviction of first-degree murder was legally insufficient is without merit.

c.  Ineffective Assistance of Counsel

Garcia next challenges the effectiveness of his trial counsel in purportedly failing to seek suppression of certain evidence used against him at trial.  (Dkt. 1 at ECF 6–7.)  Specifically, Garcia claims that "[t]rial counsel failed to file meritorious motions and call available witnesses

and present available evidence that would have exculpated defendant Garcia[.]"  (Dkt. 1 at ECF 6.)

Garcia bears the burden to demonstrate that his trial counsel's performance was so inadequate as to violate the Sixth Amendment right to assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 688, 696 (1981).  To prevail, Garcia must show both that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694; *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004) (a habeas petitioner bears the burden of establishing both deficient performance and prejudice).

The first prong requires a showing that counsel's performance was deficient. Constitutionally effective counsel embraces a "wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690).  The Court examines the reasonableness of counsel's actions under the totality of the circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight."  *Id.* at 319 (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)).

The second prong focuses on prejudice to the defendant.  The defendant is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "Reasonable probability" means that the errors were of a magnitude such that it "undermines confidence in the

outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694).

AEDPA requires federal courts to grant state courts substantial "deference and latitude" when considering an ineffective assistance of counsel claim on habeas review. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). Indeed, review of a state court's rejection of an ineffective assistance claim is "doubly deferential" and is subject to a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Knowles v. Mirzavance*, 556 U.S. 111, 123, 124 (2009).

To obtain federal habeas relief on a claim of ineffective assistance that previously was denied by a state court either on direct appeal or through collateral attack, Garcia must do more than convince the Court that, in its independent judgment, the state court incorrectly applied the standard for ineffective assistance of counsel set forth in *Strickland*. *Bell v. Cone*, 535 U.S. 685, 699 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 365 (2000)). Rather, Garcia must demonstrate that the state court applied *Strickland* in an objectively unreasonable manner. *Williams*, 529 U.S. at 365; *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) ("Some increment of incorrectness beyond error is required" but "the increment need not be great") (citing *Francis S v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

i.   Failure to Move to Suppress Fruits of Purportedly
Warrantless Search of Apartment—Petitioner's Statements

Garcia claims that his counsel should have filed a motion to suppress evidence gathered during the purportedly warrantless search of a third-party's apartment at which Garcia was a guest at the time of the search. Garcia, through counsel in his reply brief, argues that trial counsel "knew, or should have known, that the police arrested [Garcia] in violation of *Payton* [*v. New York*, 445 U.S. 573 (1980)]." (Dkt. 14 at 6.) Following his arrest, Garcia made

incriminating statements, including a confession at the police station, which were used against him at trial.  Garcia alleges these statements should have been suppressed.  (Dkt. 14 at 8.)

In *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986), the Supreme Court held that where an ineffective assistance of counsel claim is premised on counsel's failure to make a suppression motion, to satisfy *Strickland's* "prejudice" prong the petitioner must prove that the underlying claim for suppression of the evidence was "meritorious" and that "there is a reasonable probability that the verdict would have been different absent the excludable evidence . . . ." *Id.*; *see Maldonado v. Burge*, 697 F. Supp. 2d 516, 528 (S.D.N.Y. 2010) (for a suppression motion to be "meritorious," there must be "at minimum, a reasonable probability that the suppression motion would succeed, and quite possibly that [] the suppression motion would in fact succeed").  Defense counsel "is not required automatically to file a suppression motion in every case involving evidence or statements obtained after a search; rather, counsel must use 'professional discretion in deciding whether there are sufficient grounds' for such a motion." *United States v. Aulet*, 618 F.2d 182, 187–88 (2d Cir. 1980) (citing *LiPuma v. Comm'r, Dep't of Corrections*, 560 F.2d 84, 93 (2d Cir. 1977)).

Garcia's counsel's failure to move to suppress Garcia's post-arrest statements was not ineffective assistance because Garcia's statements were not obtained illegally, and therefore did not justify suppression.  Although, as Petitioner argues, the police's warrantless entry into the home of Garcia's sister to arrest Garcia violated the Fourth Amendment, *see Payton,* 445 U.S. at 575, the subsequent obtaining of Garcia's post-arrest statements once he was *outside* the sister's home did not violate the Constitution.

In *Payton*, the police entered the defendant's home without consent or a warrant, but with probable cause to arrest Payton for murder.  445 U.S. at 576.[14]  Payton was not home when the police entered, but the officers saw in plain view a shell casing and seized it.  The shell casing was later introduced at Payton's trial.  *Id.*  The Supreme Court overturned Payton's conviction, finding that the evidence found at Payton's home was obtained in violation of the Fourth Amendment.  *Id.* at 576, 583.  The Court announced that "'at the very core of the Fourth Amendment stands the right of a man to retreat into his home and there be free from unreasonable governmental intrusion.'  In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  *Id.* at 589–90 (citing *Silverman v. United States*, 365 U.S. 505, 511 (1969)).

Ten years later, in *New York v. Harris*, 495 U.S. 14 (1990), the Supreme Court limited the scope of the exclusionary rule established in *Payton*.  Similar to *Payton*, the police in *Harris* entered the defendant's home without a warrant, but with probable cause to arrest.  *Id.* at 15.  Unlike in *Payton*, however, the police in *Harris* found the suspect inside the home.  The officers arrested Harris, gave him *Miranda* warnings, removed him from his home, and brought him to the police station for questioning.  *Id.* at 16.  There, Harris was once again read his *Miranda* rights, at which point he signed a written inculpatory statement.  *Id.*

The Supreme Court upheld the introduction at trial of Harris's inculpatory statement and a subsequent videotaped confession.  *Id.* at 17–18.  The Court assumed that the police entered Harris's home without consent and without a warrant, but with probable cause to arrest him.  *Id.*

---

[14] The Supreme Court did not analyze the case based on exigent circumstances because the New York Court of Appeals had not based its decision on that theory.  The Court did note, however, that exigency may have supported the police's entry into the home.  *Id.* at 582–83.

at 17. The Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton.*" *Id.* at 21.

The *Harris* court distinguished that case from *Payton* based on *Payton*'s focus on the "'overriding respect for the sanctity of the home . . . .'" *Id.* at 17 (citing *Payton*, 445 U.S. at 601). The *Harris* Court reasoned that "[n]othing in the reasoning of [*Payton*] suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the home." *Id.* at 18. As a result, "[b]ecause the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings, and allowed to talk." *Id.* The Court concluded that Harris's statement, taken outside his home and at the police station, "was not the product of being in unlawful custody. Neither was it the fruit of having been arrested in the home rather than someplace else," and accordingly was not unlawfully obtained. *Id.* at 19. Moreover, the court "decline[d] to apply the exclusionary rule in this context because the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." *Id.* at 17.

The Second Circuit adopted *Harris*'s reasoning in *Mosby v. Senkowski*, 470 F.3d 515, 521 (2d Cir. 2006). In *Mosby*, the police had conducted a "buy and bust" operation in which the defendant sold crack cocaine to a police informant. *Id.* at 517. Later, the police went to the defendant's home to arrest him without a warrant. *Id.* After his arrest, the defendant made

several incriminating statements after being *Mirandized* regarding an unrelated homicide. *Id.* at 517–18.

In finding that the defendant's post-arrest statements should not be suppressed, the Second Circuit applied *Harris*'s rule that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." *Id.* at 521 (citing *Harris*, 495 U.S. at 21).  The Second Circuit deemed Mosby's confession, which was made after the defendant had been removed from the home, to not be a product of any *Payton* violation, and therefore did not require suppression. *Id.* at 521–22.  The panel held that the defendant's Fourth Amendment claim to exclude the stationhouse confession made after his unlawful arrest "would almost certainly fail before even reaching a full attenuation analysis." *Id.* at 521.

The circumstances of this case are highly similar in this respect to those of *Harris* and *Mosby*.  Police officers entered Garcia's sister-in-law's home, at which Garcia was an overnight guest (and therefore had a reasonable expectation of privacy), without a warrant, but based on probable cause to arrest him. (Dkt. 10-8 at 10.)  At approximately 3:00 a.m., Garcia was arrested and removed from the apartment. (*See* Dkt. 10 at ECF 73, 87–88.)  After being removed from the apartment building and while in transit to the police precinct and at the precinct, Garcia made multiple incriminating statements regarding his involvement in the robbery. (Dkt. 10 at ECF 88.)[15]  Consistent with *Mosby* and *Harris*, those statements, which were not made within the

---

[15] Garcia made both pre- and post-*Miranda* inculpatory statements. (*See* Dkt. 11-2 at ECF 39; Dkt. 10 at 73–74.)  The trial court determined that Garcia's pre-*Miranda* statements were not made in response to police interrogation and therefore did not warrant suppression, and that his post-*Miranda* statements at the precinct were made after a knowing and voluntary waiver of his rights.  The Court is unable to locate in the record the trial court's January 28, 2003 order

home, did not warrant suppression. The police had probable cause to arrest Garcia based on his identifications by Juan Calderon, the owner of the pawn shop where Garcia immediately sold the jewelry from the robbery and who recognized Garcia from his photograph displayed on television, and two other eyewitnesses (Daniel Mehias and Blanca Rodriguez) who were in the store at the time of the robbery. Garcia, therefore, was properly under arrest at the time he made the incriminating statements, which were given after he was removed from the home where he was staying and after he had been advised of, and waived, his *Miranda* rights. These facts take this case outside the principle established in *Payton* and bring it within the holding of *Harris*, which does not support suppression of Petitioner's post-arrest statements. As to Garcia's pre-*Miranda* statements, the trial court found that those statements were made voluntarily and not in response to police interrogation. (*See* Dkt. 11-1 at ECF 24, 80.) Moreover, Garcia did not challenge his conviction on direct appeal based on the use of his pre-*Miranda* statements, nor did he challenge his counsel's representation as ineffective on direct appeal or in his 440 Motion, and therefore a claim for habeas relief on those bases is procedurally barred from this Court's review on habeas. (Dkt. 11-1 at ECF 80.)

Accordingly, because Garcia's post-arrest statements were not suppressible on the basis of a *Payton* violation, it was not ineffective for Garcia's trial counsel not to move for their exclusion. Nor was Garcia prejudiced by his counsel's failure to move, given that the motion was not meritorious.

---

regarding the suppression hearing. Therefore, the Court credits Respondent's sworn statement submitted in connection with Petitioner's 440 Motion that the trial court so ruled, and which Petitioner does not contest. (Dkt. 11-2 at ECF 39.)

ii.   Failure to Move to Suppress Fruits of the
<u>Purportedly Warrantless Search of Petitioner's Father's Car</u>

Garcia claims that his trial counsel was ineffective with respect to the motion he filed to suppress the fruits of the search of Garcia's father's car.  Prior to trial, Garcia's counsel moved to suppress the photograph of him that was obtained during the search of the car.  The court denied the suppression motion on the basis that Garcia had failed to establish standing to challenge the search.  (Dkt. 10-8 at ECF 10–11.)  Garcia now argues that his trial counsel was ineffective because he should have argued that the car was "operated" by Garcia and thus Garcia had standing to challenge the search.  (Dkt. 1 at ECF 7.)  This argument is without merit.

Counsel's decision not to argue that Garcia was the "operator" of the car was a tactical one that cannot give rise to an ineffectiveness claim.  Such strategic decisions fall "'squarely within the ambit of trial strategy' and therefore do not support a claim of ineffective assistance." *United States v. Krangle*, 142 Fed. App'x 504, 505 (2d Cir. 2005) (summary order) (citing *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)).  Arguing that Garcia was the operator of the vehicle would have implicated him in the August 29 Queens robbery, since there was evidence linking that car to that crime.  (*See* Dkt. 9 at 19) (the car was identified as the getaway vehicle of the August 29 Queens robbery and a semiautomatic handgun was recovered from it).  Choosing not to implicate one's client in a robbery is manifestly within the "wide range of professionally competent assistance" afforded to counsel.  *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690).  Moreover, Garcia has not established that, had his counsel argued that Garcia was the owner or operator of the car, that he should have been granted standing to challenge the search, or that the suppression motion ultimately would have been meritorious.  *See Kimmelman*, 477 U.S. at 375.  Accordingly, Garcia has failed to prove

35

that his counsel was constitutionally deficient with respect to the motion to suppress the photo recovered from Garcia's father's car.

### iii.   Failure to Move to Suppress Line-up Evidence

Petitioner also contests that his counsel was ineffective for failing to move to suppress evidence regarding the line-up, photographic array, and confirmatory identification procedures on the basis that Garcia was denied the right to counsel at the line-up.  (Dkt. 1 at ECF 7.)[16]  This claim is without merit.

A represented defendant is not entitled to have counsel present at every identification procedure.  In New York, "the presence of counsel at investigatory lineups, though desirable, is not mandated in all circumstances" and "identifications made at such lineup viewings in the absence of counsel do not necessarily require suppression."  *People v. Coates*, 74 N.Y.2d 244, 248 (1989) (citing *People v. Blake*, 35 N.Y.2d 331 (1974)).  Here, Garcia has not established that he was represented by, and thus potentially entitled to, counsel at the time of the line-up.  In any event, as the state court found in denying Garcia's suppression motion, the line-ups were proper and not tainted in any way.  In the absence of some evidence of unfairness or taint, there was no basis for suppressing any of the photographic or line-up identifications.  *See id.*

Accordingly, Petitioner has failed to establish that his trial counsel was ineffective for not seeking to exclude the identification evidence.

### iv.   Denial of Right to Testify

To establish that counsel was ineffective for denying Garcia his right to testify, Garcia must establish both prongs of the *Strickland* standard.  *See Brown v. Artuz*, 124 F.3d 73, 79–80

---

[16] Petitioner's trial counsel moved to suppress this evidence on a different ground, arguing that the identification procedures were tainted and unfair.  (Dkt. 10-8 at ECF 10–11, ECF 39.)  The trial court granted a hearing on the suppression motions, and ultimately denied them.  (Dkt. 10-8 at ECF 39.)

(2d Cir. 1997).  Garcia, through his counsel in his 440 Motion, alleges that "counsel deprived him of [his right to testify] when he inexplicably rested before calling [Garcia] to the witness stand."  (Dkt. 10-8 at ECF 33.)  When Garcia's counsel informed the trial court that Garcia would not be presenting a case, counsel stated the following in Garcia's presence:

> [THE COURT:] Mr. Wallenstein, is there going to be a defense case?
>
> MR. WALLENSTEIN: No, your Honor.
>
> THE COURT: The defense rests then?
>
> MR. WALLENSTEIN: The defense will rest, yes.
>
> THE COURT: Thank you.
>
> MR. WALLENSTEIN: Judge, on that score I would just point out that I have discussed this matter at length with my client. We have both been here all the time that the evidence has been presented. He has heard everything that has been presented to this Court as well and he and I have very carefully discussed the issue of presenting a case or having him testify and he has chosen not to do so.
>
> THE COURT: Thank you.

(Dkt. 10-7 at ECF 80–81.)  In light of this statement to the trial court, made in the presence of Garcia without his objection, there simply is no basis for Garcia's unsubstantiated claim that his counsel rested without affording Garcia the opportunity to testify.  Garcia sets forth no evidence in support of his bald contention that he was denied the right to testify, and the record belies his claim.

Furthermore, even assuming *arguendo* that Garcia's counsel was ineffective for not presenting Garcia's testimony at trial, Garcia must demonstrate prejudice arising from such allegedly deficient performance.  Garcia does not point to what his testimony would have been or how such testimony would have altered the outcome of the case.

Accordingly, Garcia's claim that his trial counsel was constitutionally deficient for denying him his right to testify is without merit.

*CONCLUSION*

For the reasons set forth above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is dismissed as untimely under 28 U.S.C. § 2244(d)(1).  Even if the petition were not time-barred, the claims Garcia asserts are either procedurally barred, without merit, or both.

Garcia is denied a certificate of appealability, as he has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see Middleton v. Att'ys Gen.*, 396 F.3d 207, 209 (2d Cir. 2005) (petitioner has not shown that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further").  Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED:

  /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: March 7, 2014
        Brooklyn, New York

38